Richard Grissom #33728
Name

HCF, P.O. Box 1568

Hutchinson, KS 67504
Address

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| Richard Grissom, Plaintiff (Full Name) | CASE NO. 19-3178-SAC (To be supplied by the Clerk) |
|---|---|
| V. | |
| Andrew J. Palm, et al., Defendant (s) | CIVIL RIGHTS COMPLAINT PURSUANT TO 42 U.S.C. §1983 |

## A. JURISDICTION

1) Richard Grissom (Plaintiff), is a citizen of Kansas (State)

who presently resides at Hutchinson Correctional Facility * P.O. Box 1568 * Hutchinson. (Mailing address or place of confinement.)

2) Defendant Andrew J. Palm (Name of first defendant) is a citizen of El Dorado, Kansas (City, State), and is employed as SST/CSI (Position and title, if any). At the time the claim(s) alleged in this complaint arose, was this defendant acting under the color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

(see attached page 2)

XE-2 8/82                    CIVIL RIGHTS COMPLAINT §1983

1.

Defendant, Andrew J. Palm, individually and in his official capacity, who at all times mentioned in this Complaint acted under the color of state law was the Officer In Charge and First Sergeant of A2 cellhouse and SST member at EDCF.

Defendant, Daniel Schnurr, individually and in his official capacity, who at all times mentioned in this Complaint acted under the color of state law was the Warden at EDCF responsible for the operation of the facility, supervisor over staff and responsible for the welfare of all inmates in that prison.

Defendant, Maria Bos, individually and in her official capacity, who at all times mentioned in this Complaint acted under the color of state law was the Classification Administrator at EDCF.

Defendant, Dustin Randolph, individually and in his official capacity, who at all times mentioned in this Complaint acted under the color of state law as the Unit Team Manager at EDCF.

Defendant, Andrew Fuoss, individually and in his official capacity, who at all times mentioned in this Complaint acted under the color of state law was the Unit Team at EDCF.

Defendant, Patrick Mansfield, individually and in his official capacity, who at all times mentioned in this Complaint acted under the color of state law was the Captain and Shift Supervisor at EDCF.

Defendant, Jessica Link, individually and in her official capacity, who at all times mentioned in this Complaint acted under the color of state law was the Sergeant in charge of the Property Room at EDCF.

Defendant, Abraham Loewen, individually and in his official capacity, who at all times mentioned in this Complaint acted under the color of state law was a Corporal and second officer in A cellhouse at EDCF.

Defendant, Names Unknown, individually and in his official capacity, who at all times mentioned in this Complaint acted under the color of state law was the officer who responded to the "Officer Needs Assistance" code on 11/25/17 at approximately 8:30pm at EDCF.

3) Defendant _____ is a citizen of
                        (Name of second defendant)

_____, and is employed as
                (City, state)

_____. At the time the
            (Position and title, if any)

claim (s) alleged in this complaint arose was this defendant acting under the color of state law? Yes ☐ No ☐ . If your answer is "Yes", briefly explain:

_____

_____

_____

4) Jurisdiction is invoked pursuant to 28 U.S.C. §1343(3); 42 U.S.C. §1983. (If you wish to assert jurisdiction under different or additional statutes, you may list them below.)

*The Court has supplemental jurisdiction over the Plaintiff's state law tort claims under 28 U.S.C. § 1367.*

B. NATURE OF THE CASE

1) Briefly state the background of your case:

*(see attached pages 4-13)*

_____

_____

_____

_____

_____

_____

XE-2 8/82                CIVIL RIGHTS COMPLAINT §1983

3.

## NATURE OF THE CASE

1.) On 12/31/96 Plaintiff was transferred to EDCF (El Dorado Correctional Facility) and confined in long term ad seg. Plaintiff has large sized wrists and regular sized cuffs were too small which caused restricted blood circulation, numbness and pain to his hands. He also suffered a broken scapula in the past that restricted movement in his muscular shoulders so Plaintiff was immediately approved by medical and the Seg Lieutenant for "large" cuffs when being restrained with his hands in front of him encased in a metal black box, (exh. A para. 1). Subsequently, when they discontinued using the black box method and started cuffing his hands behind his back, Plaintiff was immediately approved by medical and the Seg Lieutenant to be restrained with two sets of "large" cuffs, aka: double-cuffing, (exh. A para. 2). Later the facility purchased a set of "large extra length" cuffs that had approximately a six inch chain in the middle connecting the cuffs together to replace having to use two sets of large cuffs and a magnetic sign was affixed to Plaintiff's metal door stating in bold black letters "large extra length" to ensure that all officers utilized the correct cuffs when restraining him, (exh. A para. 3).

2.) The OIC (Officer In Charge) of the ad seg cellhouse on every shift were all aware that Plaintiff was approved for and required the large extra length cuffs when restrained. Defendant Palm worked several years in ad seg and for well over a year as the OIC in ad seg and had personally cuffed Plaintiff over 200 plus times, "always" utilizing the large extra length cuffs or if not available he used two sets of large cuffs and mandated all his subordinates to comply as well, (exh. A para. 4). It must be noted that Defendant Palm worked as the OIC in Plaintiff's ad seg cellhouse approximately from 2014-2016 so he knew without a doubt that Plaintiff was approved for and required large extra length cuffs or two sets of large cuffs whenever he had to be restrained.

3.) As a Native American practicing his religious beliefs, Plaintiff received approval by the Chaplain to possess his own medicine (sage, cedar and sweetgrass), medicine bag and feathers while confined in ad seg so he purchased those items in May 2016 and received it in June 2016, (exh. B1). On 7/20/16 the Chaplain approved Plaintiff to take his medicine to ad seg yard to smudge with so he ordered additional medicine from Crazy Crow in August 2016, (exh. B1-2).

4.) In September 2016, UTM (Unit Team Manager) Matthew Moore placed Plaintiff's 8/16 Crazy Crow order of medicine on the OIC's desk for distribution, but Defendant Palm refused to give it to him and stated that he was not allowed to possess it while confined in ad seg. Plaintiff showed Defendant Palm through the celldoor window that he was already in possession of medicine he had purchased five months earlier with Chaplain's approval, but he still refused to distribute it to him, so Plaintiff informed UTM Moore of the problem. UTM Moore was Defendant Palm's superior so he issued a directive and made him distribute Plaintiff's Crazy Crow medicine order to him. Defendant Palm openly displayed his anger by slamming Plaintiff's food pass shut loudly, which is considered disrespectful, after distribution, (exh. A para. 6).

5.) On 12/5/16 Plaintiff was released from 20 consecutive years of ad seg confinement to gen-

4.

eral population. Shortly after his release, Plaintiff was unanimously voted and appointed as Chief, aka: Chairman, of the Native American religious callout at EDCF, (exh. B4).

6.)  A2 cellhouse was considered to be a "honor" cellhouse for workers and was where Plaintiff was being housed and working as the head cellhouse porter. Approximately a week prior to 11/25/17 Defendant Palm was the OIC in A2 cellhouse and was abusing his authority to the point that the inmates were on the brink of rioting due to his actions. Defendant Patrick Mansfield was the shift Captain and supervisor and was informed of Defendant Palm's actions. Defendant Mansfield immediately came to A2 cellhouse and reassigned Defendant Palm to a different post for the remainder of the shift to quell the possible uprising. Numerous grievances have been filed in the past against Defendant Palm for abuse of discretion, excessive force, and etc, so his antics and proclivity to cause turmoil is well documented and known by his supervisors and the administration at EDCF. Defendant Palm was not reassigned to A2 cellhouse again until 11/25/17 and Defendant Mansfield was the shift supervisor on that date, (exh. A para. 8).

7.)  On November 25, 2017 at approximately 8:30pm, Plaintiff was inside his cell preparing for the next days morning Pipe and Drum ceremony. As the Chief of the Native American religious callout it is his responsibility to ensure that he has enough personal medicine to conduct the ceremonies so he had it laid out on his desk along with his feathers and other religious artifacts contained in a clear plastic see-thru art bin box. Each medicine was contained in its own clear see-thru 3"x12" plastic bag that was clearly marked in all capital one inch tall Roman style black solid letters stenciled onto white labels identifying the contents of each bag. Plaintiff had authorization to purchase and possess all of his Native American medicine and artifacts by the Chaplain and IMPP (Internal Management Policy and Procedure) 10-110, (exh. A para. 9).

8.)  Plaintiff's desk was clearly visible from the celldoor window so there was nothing obstructing the visibility of his actions, such as a sheet that's often used for privacy. Defendant Palm was the OIC and was conducting his security checks when he saw Plaintiff holding a plastic see-thru bag of cedar that was approximately 3" in diameter and 6" long that was clearly marked "cedar". This was the "same" cedar that Defendant Palm initially refused to distribute to Plaintiff the previous year when he was housed in ad seg, (exh. A para. 10).

9.)  Defendant Palm asked, "What's that?" Plaintiff replied, "It's cedar, my own personal medicine." Defendant Palm replied, "Bring that to me." Plaintiff immediately remembered the difficulty he had the previous year over the same thing so he said, "Call Captain Mansfield down here because you're messing with me." Defendant Palm stated, "I'm not doing it. I want to see that." Plaintiff replied, "I can't, the door is closed." Defendant Palm ordered control to open Plaintiff's door, (exh. A para. 11).

10.)  Plaintiff wanted to show Defendant Palm that he absolutely nothing to hide so he voluntarily picked up the entire clear plastic art bin box to show that his medicine and other religious artifacts were clearly marked and authorized, although Defendant Palm specifically only asked to see the bag of cedar he was holding, (exh. A para. 12).

5.

11.) Plaintiff's celldoor was open so he handed Defendant Palm the clear bag of cedar and asked, "Why are you messing with me when you already know this is the same stuff I was authorized to have in seg?" Defendant Palm did not respond and proceeded to open the bag of cedar, then contaminating it by touching the cedar with his unclean and non purified hands. Plaintiff responded, "Stop! You are unclean and contaminating my medicine. Call the Captain, he knows how to check it and knows what it is." Defendant Palm replied, "No, it's my job to search it." Plaintiff replied, "No you can only confiscate it, and you're not allowed to touch it. Just call Captain Mansfield if you think that I'm lying." (exh. A para. 13).

12.) IMPP 10-110D "Instructional Material Concerning Native American Religious Artifacts" 5
   b. Ordinarily the offender should handle the bag or other religious artifact at all times and neither the bag or its contents, nor any other religious artifact, should be touched by the staff member.
   c. If there are questions or problems regarding the inspection of a medicine bag or other religious artifact, the staff member shall confiscate the bag or other religious artifact and, with an evidence card attached, place the bag or other religious artifact in a secured location as evidence.
   d. To ensure that religious artifacts are treated with respect by the examining staff, the chaplain's/warden's/superintendent's designee, shall be present when a medicine bag and contents (or any other religious artifact), placed in evidence, is examined.   (exh. B 5)

13.) It is vividly apparent that Defendant Palm violated policy and procedures mandated by IMPP 10-110D (b)(c)(d) and exhibited deliberate indifference to Plaintiff's 1st Amendment Rights. As a member of the SST (Special Security Team) and holding the rank of First Sergeant Defendant Palm was supposed to be trained on how not to touch Native American medicine and artifacts. By Defendant Palm's blatant disregard for policy and procedures it exhibits his state of mind at the time of the incident, that his actions were beyond reproach and that he would do whatever he wanted. Defendant Palm intentionally, willingly and knowingly violated Plaintiff's 1st Amendment Rights and state created liberty interests.

14.) Defendant Palm looked down at the box Plaintiff was holding, that contained his medicine and other religious artifacts and stated, "Give me that too." Plaintiff reached for the cedar that Defendant Palm was holding and said, "Then give me that back," but Defendant Palm snatched it back and replied, "No" and stuck the bag of cedar in his pocket. Plaintiff responded, "Then let's go to the Captain's Office and see what he says." Defendant Palm replied, "You want to see the Captain? Then turn around and cuff up." Plaintiff replied, "Why do you go out of your way to mess with me?" Defendant Palm responded, "It's my job and I mess with everybody," (exh. A para. 14). Plaintiff was not being disruptive and Defendant Palm wanted to cuff him for requesting to see the Captain out of vindictiveness and there was no penological interest to legitimately place Plaintiff in cuffs.

15.) Plaintiff looked down to see that Defendant Palm only had a single pair of regular sized black hinged cuffs and stated, "I need the large extra length cuffs because these won't fit me." Defendant Palm said, "I will make them fit, now cuff up." Plaintiff responded, "You worked in ad seg so you already know

6.

they're too small from cuffing me up then." Defendant Palm replied, "I will take that as a refusal" and called over the radio the emergency code that "Officer needs assistance." Plaintiff replied, "Good, now we can go see the Captain." This emergency code was called without any provocation from Plaintiff. (exh. A para. 15). It must be reiterated that Defendant Palm within the past two years had cuffed Plaintiff in ad seg well over 200 plus times using the "large extra length" cuffs or two sets of "large" cuffs so his refusal to use the appropriate sized cuffs exhibits his frame of mind at the time of the incident and deliberate indifference to Plaintiff's approved medical needs. Defendant Palm knew that to restrain Plaintiff in a single pair of regular cuffs would inflict bodily injury and wanton pain and this must be considered as cruel and unusual punishment in violation of the 8th Amendment and liberty interests. The K.A.R. (Kansas Administrative Regulations) 44-5-106 provides:

(c) No restraining device shall be applied in a manner which would cause significant physical pain or undue discomfort, restrict blood circulation or breathing, or otherwise injure or incapacitate the inmate beyond the extent necessary to maintain security and control. (exh. B6).

Defendant Palm knowingly, willfully and intentionally refused to utilize the correct sized medically approved cuffs in violation of state statutes.

16.) Defendant Abraham Bowen was the second officer working inside of A2 cellhouse, and without any urgency because he could visibly see that Plaintiff was "not" being disruptive took his time, and did not run, but "walked" up the stairs and stood outside the cell and continued observing. (exh. A para. 16).

17.) Plaintiff turned around and allowed Defendant Palm to attempt to cuff him in a single pair of regular sized cuffs despite its futility because he was attempting to comply with the order given to him. Defendant Palm stated, "Twist your wrist." Plaintiff replied, "I can't, my shoulders won't allow it and that's why I need the large extra length cuffs or use two sets of large cuffs." Defendant Palm replied, "You're not authorized for large cuffs and you're not on the list for double cuffs." Plaintiff responded, "Call the Captain down here, you already know that I am authorized for large extra length cuffs from cuffing me in seg." (exh. A para. 17). It must be noted that the "hinged" cuffs Defendant Palm was using are designed to restrict movement thats prohibits any twisting motion of the wrists that was being requested unlike the freedom of movement the chain cuffs provides. The thumbs up position Defendant Palm was attempting requires shoulder flexibility which Plaintiff does not possess. (exh. A para. 18)

18.) For a second time, Plaintiff turned around again and allowed Defendant Palm attempt to cuff him and again Defendant Palm replied, "Turn your wrist." Plaintiff replied, "I can't my wrists don't turn that way because of my shoulders, and that's why I need the large extra length cuffs." Defendant Palm replied, "Stop resisting" and started forcibly twist Plaintiff's wrist which instantly caused pain. Plaintiff turned and faced Defendant Palm and repeated, "I need the large extra length cuffs, call the Captain." Defendant Palm replied, "No, turn around and cuff up." (exh. A para 19).

19.) Again, Plaintiff turned around and Defendant Palm forcibly twisted his left wrist into one side of the cuffs instantly sending jolts of pain to Plaintiff's wrist and shoulder. The pain was intense causing Plaintiff to instinctively lower his left shoulder causing his wrist to pop free of the cuffs, when he felt

7.

Defendant Palm strike him in the back with the metal hinged cuffs. (exh. A para. 21).

20.) Plaintiff faced Defendant Palm and retreated back into his cell when he saw Defendant Palm holding the hinged cuffs in his right hand doubled together as if he was wielding a pair of brass knuckles. Defendant Palm advanced towards Plaintiff in an aggressive manner as if he was about to hit Plaintiff with the metal cuffs and Plaintiff responded, "Don't do it," but Defendant Palm still swung the metal cuffs towards Plaintiff's head, which he blocked with his left hand. Plaintiff replied, "What the hell is wrong with you?" Defendant Palm never uttered another word or warning as he struck the metal cuffs towards Plaintiff's head again, and again Plaintiff blocked it from hitting his face. (exh. A para. 22).

21.) During this time, Defendant Palm stood in a fighting stance, was the aggressor and initiated all physical contact while wielding the metal cuffs as a weapon. Whereas, Plaintiff had retreated back into his cell in an attempt to avoid any physical confrontation, did not throw any punches and only defended himself by deflecting Defendant Palm's punches and strikes while wielding the metal cuffs. (exh. A para. 23). Defendant Palm attacked Plaintiff at least three separate times with intent to inflict physical injury and pain. On the third attack, Plaintiff responded, "Stop it before I hurt you" and pushed Defendant Palm backwards causing him to fall against the cell entrance. Defendant Palm, without saying a word or issuing a warning, deployed mace spray into Plaintiff's eyes temporarily blinding him, while Defendant Loewen stood by watched the attack and did not intervene or say anything. (exh. A para. 24).

22.) Defendant Palm grabbed Plaintiff's outstretched left arm that he was using to block with his hand the mace being deployed into his eyes and attempted to pull Plaintiff's face down into the ground, causing him to fall forward and exit the cell onto the tier. Plaintiff wrapped his arm around Defendant Palm's waist to prevent himself from doing a face plant into the concrete floor. Defendant Palm placed Plaintiff in a headlock and the metal items on his duty belt were grinded to the side of Plaintiff's face causing intense pain. (exh. A para. 25).

23.) Plaintiff swung his right arms upward in an attempt to grab Defendant Palm but never made any physical contact. Plaintiff was experiencing pain in his head from the metal on Defendant Palm's duty belt and is uncertain if this was the time he was being struck in the head by the bottom of the metal mace can but he wanted the pain to cease, so he picked Defendant Palm up by his legs and was going to body slam him. But Plaintiff instantly realized that this could inflict severe bodily injury to Defendant Palm and decided against it, so he "gently" laid him onto the tier and pushed Defendant Palm off of him. (exh. A para. 26). During the assault and battery by Defendant Palm, he maliciously struck Plaintiff in the head repeatedly with the metal bottom of the mace can utilizing it as a weapon intentionally to inflict the maximum amount of bodily injury and wanton pain, which resulted in more than (10) swollen knots to appear across Plaintiff's head. Defendant Loewen and the other officers responding to the incident did not intervene to stop Defendant Palm from attacking Plaintiff. (exh. A para. 27). The failure to protect Plaintiff or intervene violated his constitutional rights against the 8th Amendment of cruel and unusual punishment and his liberty interests, and they exhibited deliberate indifference.

8.

24.) After laying Defendant Palm on the ground, two SST (Special Security Team) members responding to the code approached Plaintiff and asked him if he would cuff up? Plaintiff responded, "That's what I've been trying to do but I need the large extra length cuffs." SST asked, "What if we use two sets?" Plaintiff replied, "That'll work," and he was escorted to the Captain's Office without further incident. (exh. A para. 28). To date, Plaintiff is medically approved for two sets of "large" sized cuffs, (exh. B7-8) at HCF.

25.) Upon arrival at the Captain's Office, Defendant Mansfield was the shift supervisor and Plaintiff informed them of what occured and that he was planning on suing them for excessive force and for violating his 1st and 8th Amendment Rights. (exh. A para. 29). As the Captain and shift supervisor Defendant Mansfield had removed Defendant Palm from A2 cellhouse approximately a week prior to this incident and reassigned him to a different post due to his abuse of authority and almost causing a riot. Defendant Mansfield as shift supervisor reassigned Defendant Palm to A2 for the first time since the earlier incident on 11/25/17 knowing that Defendant Palm has the propensity to cause turmoil and was going to exert his authority even more to prove a point. After numerous grievances and complaints against Defendant Palm Defendant Mansfield failed to supervise and train him or take disciplinary action to thwart his behavior and abuse of discretion knowingly, willingly and intentionally which violated Plaintiff's constitutional rights and liberty interests.

26.) Plaintiff was placed in the infirmary and examined by a nurse who determined that he suffered numerous lacerations and bruises to his face, neck, hands, the top of his head and his back was so torn up that it appeared to the nurse as if someone had bitten him several times, which Plaintiff believes was the result of being battered in the back by Defendant Palm wielding the metal cuffs as a weapon. Plaintiff suffered nausea, painful headaches, dizzyness, blurry vision and high blood pressure. His left wrist was in constant pain and believed to have tendon damage from Defendant Palm forcibly twisting his wrist into the small regular cuffs, and he is unable to apply any pressure on it whatsoever. (exh. A para. 30). Subsequently, Plaintiff received pain medication and a metal brace to stabilize his left wrist. Even to date, his left wrist has not fully healed. Subsequently, Plaintiff has been placed on 50mg Cozaar to stabilize his high blood pressure and he never had high blood pressure problems prior to this incident.

27.) Later that night in the infirmary, numerous photos of Plaintiff's injuries and bruises were taken with a digital camera to document the incident. Plaintiff filed a grievance on 11/25/17 germane to the incident and requested the preservation of these photos of his injuries and cellhouse video for further litigation purposes. The infirmary did not have any personal injury forms so Plaintiff had to wait until Monday morning on 11/27/17 to get one provided to him by unit team Phillip Patterson. (exh. A para. 31-32).

28.) In the afternoon of 11/27/17 Plaintiff was moved from the infirmary to ad seg in a no contact cell and placed under MRA (More Restricted Area) status, denied all property, all legal materials and yard. On 11/28/17 Plaintiff attached a copy of his 11/25/17 emergency grievance to his Personal Injury Claim and gave it to unit team Andrew Fuoss to have notarized and processed. But, to date, September 11, 2019 Plaintiff has not received a response to this Personal Injury Claim and believes that the EDCF administration in-

9.

tentionally destroyed it out of retaliation. (exh. A para. 33)

29.) On 12/8/17 in the afternoon, OIC Kurtis Grammetts ordered Plaintiff to sign his Property Inventory Sheets "before" any of his property would be distributed to him. Staff refuse to distribute back an inmate his property unless he signs the inventory sheets first to prevent him from raising any discrepancies he may have after distribution. This procedure is in direct violation of the IMPP but its common practice that is supported by the administration. Plaintiff only received part of his property and at least three additional boxes were being stored in the Property Room under the supervision of Defendant Link. Plaintiff's Property Inventory Sheets only had the date of 12/8/17 on it instead of 11/25/17 when his property was supposed to have been inventoried. Plaintiff noticed numerous items in his property that did not belong to him so he immediately informed OIC Robert Petty who placed said items in the unit teams office. (exh. A para. 34). It is Plaintiff's belief that this mix-up of property, no officer's signatures identifying who inventoried said property and no dates were intentional because they possessed knowledge of retaliatory conduct that was being implemented by staff.

30.) Later that night on 12/8/17, Plaintiff was issued a disciplinary report written by Defendant Link, who was the Property Officer, for dangerous contraband and theft, due to items discovered in his property that did not belong to him. Subsequently, Plaintiff was found not guilty because it was clear that the officer's who had inventoried his property had mixed another inmates property with his and no officer wanted to accept responsibility so they did not affix their signature or identify themselves, knowing that questions would be raised at a later date as to the veracity and accuracy of the inventory. Additionally, inmates informed Plaintiff that they had witnessed Defendant Palm, Defendant Lowden and other unknown officers intentionally throw some of his property into the trash can and these inmates retrieved as much of Plaintiff's property from the trash as possible and took it to the Captain's office, hoping it'll be returned to him. (exh. A para. 35).

31.) On 12/10/17 Plaintiff submitted a form 9 to Defendant Link, requesting a copy of his 11/25/17 Property Inventory Sheet to specifically determine the identity of the officer(s) responsible for inventorying his property to no avail. There were at least two different handwriting styles that were unidentifiable as to the author but a third handwriting style was linked to Defendant Link, who also wrote the date of 12/8/17 instead of 11/25/17 on Plaintiff's Property Inventory Sheet. (exh. A para. 36), (exh. B9).

32.) On 1/8/18 Plaintiff attended seg review in the morning and informed Defendant Randolph, who was conducting the review, that he was still waiting for unit team to retrieve his three boxes of stored property from the Property Room so that he could exchange items and go through it to determine which items he wanted to send home or keep, and that the date 1/8/17 was the final day to complete this process. Other members of the seg review board witnessed Defendant Randolph telephone Defendant Link and ordered her "not" to destroy Plaintiff's stored property and that he would send unit team in the near future to retrieve said stored property and afford Plaintiff the opportunity to go through it. Defendant Link "agreed" not to destroy Plaintiff's stored property and continue to hold it in storage

10.

and give the unit team the necessary time needed to retrieve it from the Property Room. (exh. A para. 37). It must be noted that Plaintiff was being confined in ad seg under 24 hour lockdown so it was impossible for him to retrieve his stored property without the assistance from unit team.

33.) On 1/29/18 Plaintiff was transferred from EDCF to HCF (Hutchinson Correctional Facility) with only the property he possessed in his ad seg cell and the three boxes of property stored in EDCF's Property Room did not accompany him. This transfer occured "before" unit team retrieved his three boxes of stored property and "before" Plaintiff was afforded the opportunity to go through it as discussed during his 1/8/18 seg review. (exh. A para. 38). This violates due process of the 14th Amendment.

34.) On 1/31/18, and again on 2/14/18 Plaintiff submitted Form 9's to HCF unit team inquiring about the status of his property being stored at EDCF. (exh. B10-11). During Plaintiff's weekly seg reviews at HCF, he was repeatedly assured by unit team that his property would be sent at a later date on the transport bus, along with other inmates complaining about the same problem. At the beginning of February 2018 Plaintiff's wife phoned EDCF's Property Room and was informed by Defendant Link that she "still" possessed Plaintiff's property and that it would be forwarded to HCF shortly. (exh. A para. 39).

35.) On 3/24/18 Plaintiff sent a Form 9 to HCF's Property Room along with a copy ticket requesting a copy of his Property Inventory Sheets for 11/25/2017 and 12/8/2017 but he never received a response or his copy ticket with (10) credits. (exh. B 12). On 4/5/18 Plaintiff was informed by unit team Jeffery Pettijohn that he only found "a couple" of pages in his HCF Property File and that he still had not been informed of the status of his EDCF stored property. So Plaintiff submitted two separate Form 9's on 4/5/18 inquiring about his property and on 4/21/18 he was informed by UTS Pettijohn that his property had been "destroyed" and his property files were still missing. (exh. B 13-14).

36.) It is Plaintiff's belief that the intentional destruction of his 3 boxes of stored property that included all of his Native American medicine and Artifacts, his finished art, patterns, brand new typewriter that is "exempt" from property limitations, and etc., was in direct causal connection to the 11/25/17 incident and for being found not guilty of a disciplinary report germane to property must be considered as retaliatory conduct executed by Defendant Link and Defendant Randolph and unknown EDCF administration. Plaintiff was not afforded the opportunity to go through his property and was transferred before this opportunity transpired and the destruction of religious medicine and artifacts as well as exempt property that's used to file litigation (typewriter) must be construed as retaliation in violation of 1st, 14th and 8th Amendment of the constitution and his liberty interests. Defendants intentionally destroyed over $10,000.00 of Plaintiff's personal property.

37.) Also during Plaintiff's 1/8/18 seg review Defendant Randolph along with the seg review board recommended that he be transferred to "general population" in a different facility to avoid possible future reprisals by EDCF staff over the 11/25/17 incident. At no time during the seg

11.

review was there any mention or indication that they had planned on sending Plaintiff to long term ad seg. at HCF. (exh. A para. 40).

38.) On 1/19/18 Defendant Andrew Fuoss informed Plaintiff that he was indeed guilty of battering staff, that he would have his disciplinary hearing because he had already discussed it over with the Deputy Warden and he would be transferred to HCF long term ad seg. (exh. B15). Defendant Fuoss was also the unit team who was supposed to process Plaintiff's 11/28/17 Personal Injury Claim that is missing, the unit team who was supposed to retrieve Plaintiff's three boxes of property being held in EDCF's Property Room which ended up being destroyed, and he initiated the decision to transfer Plaintiff to long term ad seg "before" he had a hearing or been found guilty of any wrong doing. Defendant Fuoss talked to Plaintiff with anger in his voice and it must be construed as retaliatory conduct and the transfer to long term ad seg was "punishment" for something Plaintiff did not receive a hearing for or had he be found guilty of anything. The direct causal connection of retaliatory conduct violates Plaintiff's constitutional rights and liberty interests.

39.) On 1/25/18 Defendant Maria Bos sent Plaintiff an Administrative Seg Report reiterated Defendant Fuoss' recommendation to be transferred to HCF long term ad seg "before" giving him a hearing and "before" any finding of guilt. Defendant Bos was also a Defendant on Plaintiff's 2015 lawsuit and the subject of several grievances filed by him in the past. Defendant Bos was opposed to Plaintiff's release from ad seg. in December 2017 and she prematurely jumped at the first opportunity to return him to ad seg under long term without a hearing which must be considered as retaliation and punishment which violates his 1st Amendment Rights and liberty interests. (exh. A para. 41). (exh. B16).

40.) Plaintiff filed a lawsuit against EDCF administration in 2015 for rote reiteration and stale justification to confine him for almost 20 consecutive plus years. Plaintiff was released on December 5, 2016 and many EDCF administration staff exhibited opposition. Plaintiff and unit team Richard Hoover wanted to be transferred to a different Kansas facility because he believed, as well as UTS Hoover, that there would be some kind of reprisals by EDCF staff related to the lawsuit. It was also believed that he would be returned to long term ad seg at the first opportunity to do so, in retaliation to the lawsuit. Unit team Hoover's request to transfer Plaintiff in 2016 to a different facility was denied. On 11/25/17 Plaintiff filed a grievance against Defendant Palm for excessive force. On 11/28/17 Plaintiff filed a Personal Injury Claim against Defendant Palm, Defendant Lewen and Defendant Daniel Schnurr the Warden that cannot be found in the KDOC computer and was never responded to. Subsequently, Plaintiff's property was thrown in the trash can, 3 boxes were destroyed, he was written a bogus disciplinary report, transferred to long term ad seg without a hearing or finding of guilt by members of the same administration he sued earlier in 2015 and this is in proximity and direct causal connection which must be construed as retaliation to the 1st Amendment protections and violates his liberty interests. (exh. A para. 42).

41.) Defendant Daniel Schnurr was the Warden at EDCF during the time that Defendant Palm

12.

used excessive force and was in charge of the supervision and discipline of all correctional staff at the prison. Numerous grievances and complaints were filed against Defendant Palm prior to the 11/25/17 incident and Defendant Schnurr failed to take disciplinary action or other action to curb the known pattern of physical abuse, and abuse of discretion by Defendant Palm towards inmates, which constituted deliberate indifference to the Plaintiff's safety and contributed to and proximately caused the excessive force, assault and battery and violation of the 8th Amendment. When Defendant Palm was removed from A2 cellhouse approximately a week earlier to 11/25/17 for almost causing a riot due to his abuse of discretion, Defendant Schnurr failed to prohibit Defendant Palm from being assigned to the same cellhouse or to reassign him to a position that would limit his abuse of discretion or physical abuse towards inmates. Defendant Schnurr as the Warden is responsible for the policy and procedures that governs his staff's conduct and failed to prevent Defendant Palm from violating the IMPP germane to "not" touch Native American medicine and artifacts, K.A.R. Use of force or restraint on inmates, and not to use cuffs or metal mace cans as weapons. Plaintiff's wife sent a letter to Defendant Schnurr informing him that she was on the phone with him when Defendant Palm initiated the conversation on 11/25/17 and that she would be hiring an attorney to sue KDOC for the unprovoked attack. (exh B 17-18). Defendant Schnurr approved the transfer of Plaintiff to HCF long term ad seg with knowledge of the pending litigation and that Plaintiff could no longer freely telephone his wife and communicate about the incident daily once he was transferred. (As EDCF inmates had access to the phone 24 hours a day 7 days a week). Defendant Schnurr knew the transfer would impose severe restrictions on his ability to communicate with potential attorneys and thwart the progress to proceed with litigation. Defendant Schnurr also knew that Plaintiff had not received a hearing nor had he been found guilty of any wrong doing germane to the 11/25/17, that an emergency grievance and Personal Injury Claim had been filed naming him as a Defendant so he had Plaintiff transferred to long term ad seg in proximity and direct causal connection which violates the 1st Amendment and Plaintiff's liberty interest.

13.

## C. CAUSE OF ACTION

1) I allege that the following of my constitutional rights, privileges or immunities have been violated and that the following facts form the basis for my allegations: (If necessary you may attach up to two additional pages (8h" x 11") to explain any allegation or to list additional supporting facts.)

A) (1) Count I: _(see attached pages 15-17)_

(2) Supporting Facts: (Include all facts you consider important, including names of persons involved, places and dates. Describe exactly how each defendant is involved. State the facts clearly in your own words without citing legal authority or argument.):

B) (1) Count II: _____

(2) Supporting Facts: _____

XE-2 8/82              CIVIL RIGHTS COMPLAINT §1983

## CAUSE OF ACTION

**COUNT I:**

The actions of Defendant Palm knowingly, willfully and intentionally twisted Plaintiff's wrists into a single pair of regular sized cuffs with excessive force applied in bad faith after restraining him well over 200 plus times within the past few years always utilizing the large extra length cuffs or two sets of large sized cuffs exhibiting deliberate indifference to his serious medically approved needs which resulted in immediate painful tendon damage that was executed with malicious and sadistic intent to cause physical injury and wanton pain in violation of the 8th Amendment protection against cruel and unusual punishment and his liberty interests.

**Supporting Facts:** Plaintiff was approved for by medical and the Seg Lieutenant to be restrained in large extra length cuffs or two sets of large sized cuffs (para 1). Defendant Palm was well aware of Plaintiff's needs that were medically approved for large extra length or two sets of double cuffs from restraining him over 200 plus times in the past couple of years (para 2). Defendant Palm refused Plaintiff's requests for longer cuffs and stated that he would "make them fit" (para 15). Defendant Palm forcibly twisted Plaintiff's left wrist into a single pair of regular sized cuffs after two other attempts instantly causing pain and injury (para. 16-19). Plaintiff was not being disruptive and there was no need to even restrain Plaintiff and a second officer witnessed this so application of the cuffs must be considered in bad faith. (para 16).

**COUNT II:**

The actions of Defendant Palm knowingly, willfully and intentionally applied excessive force in an unprovoked attack by initiating all physical contact while wielding metal handcuffs and a metal mace can as weapons to maliciously and sadistically strike Plaintiff repeatedly in the back, hands, face and head to inflict maximum bodily injury and wanton pain as possible executed in bad faith without need or provocation constituting the tort of assault and battery under Kansas law and violates the 8th Amendment protection against cruel and unusual punishment and his liberty interests.

**Supporting Facts:** Defendant Palm struck first and attempted to strike Plaintiff with the metal cuffs, wielding them like brass knuckles, in the head several times after successfully striking him in the back, and Plaintiff had retreated into his cell to avoid physical contact that was initiated by Defendant Palm (para. 19-21). At some point during this attack by Defendant Palm, Plaintiff was struck in his head repeatedly by the bottom of the metal mace can by Defendant Palm (para 23). Plaintiff received numerous lacerations and bruises on his neck, back, hands, face and head that were painful, including nausea, headaches, blurry vision, dizziness and high blood pressure which he must now take medication for (para 26).

**COUNT III:**

The actions of Defendant Loewen and all unknown officers who responded to the code on 11/25/17, failed to intervene or prevent the excessive force attack by Defendant Palm exhibited deliberate indifference in violation of the 8th Amendment protection against cruel and unusual punishment and his liberty interests.

15.

Supporting Facts: Defendant Loewen was the second officer in the cellhouse and stood within arm's reach just outside of Plaintiff's celldoor.(para.16). During the entire attack on Plaintiff, Defendant Loewen and all other officers responding to the code did not intervene to stop the attack or protect Plaintiff.(para.23).

COUNT IV:
In the actions of Defendant Mansfield and Defendant Schnurr knowingly, willfully and intentionally failed as supervisors to take disciplinary or other actions to curb the known pattern of physical abuse and abuse of discretion against inmates by Defendant Palm constituted deliberate indifference to the Plaintiff's safety and contributed to and proximately caused the above-described violation of the Eighth Amendment and assault and battery.

Supporting Facts: Numerous grievances and complaints were filed against Defendant Palm prior to this incident, including the reassignment of Defendant Palm to a different post a week earlier that almost erupted into a riot in Plaintiff's cellhouse because of his abuse of discretion.(para.6)(para.13). Despite the complaints Defendant Mansfield and Defendant Schnurr allowed Defendant Palm to continue his abuse by reassigning him back to Plaintiff's cellhouse on 11/25/17 (para.6).

COUNT V:
In the actions of Defendant Link, Defendant Randolph and Defendant Fuoss, knowingly, willfully and intentionally destroyed Plaintiff's personal property and Native American religious artifacts executed as retaliatory conduct without due process in violation of the 14th Amendment and his liberty interests.

Supporting Facts: Plaintiff's Property Inventory Sheets did not have the correct date his property was supposedly inventoried, and there were at least (3) different handwriting styles on it but no signature of the officer(s) responsible for the accuracy. (para.29-31). Inmates informed Plaintiff that they had witnessed officers throwing his property in the trash can but they retrieved it and took it to the Captain's Office (para.30). Defendant Link issued a disciplinary report against Plaintiff over property issues but subsequently found not guilty.(para.30). On 1/8/18 Defendant Randolph ordered Defendant Link not to destroy Plaintiff's (3) boxes of stored property during seg review and she agreed, and either he or Defendant Fuoss would retrieve said stored property in the near future to afford Plaintiff to exchange and go through his property. (para.32). Defendant Randolph and Defendant Fuoss failed to retrieve Plaintiff's stored property and transferred him to a different facility 3 weeks later on 1/29/18.(para.33). On 4/21/18 Plaintiff was informed by HCF unit team Pettyjohn that his property had been destroyed by EDCF (para.35.)

COUNT VI:
In the actions of Defendant Bos, Defendant Randolph, Defendant Fuoss and Defendant Schnurr knowingly, willfully, and intentionally exhibited retaliatory conduct against Plaintiff in the proximity and direct causal connection to a lawsuit, grievances and Personal Injury Claim filed against EDCF

16.

administration and staff in violation of the 1st Amendment and his liberty interests.

Supporting Facts: On 1/8/18 during seg review Defendant Randolph informed Plaintiff that he and the seg review board was recommending transfer to "general population" in a different facility to avoid possible reprisals by EDCF staff, and there was no mention of placing him in long term ad seg. (para.37). On 1/19/18 Defendant Fuoss angrily informed Plaintiff that he was guilty of battering Defendant Palm, that he would have his disciplinary hearing, transferred to long term ad seg and that he had discussed this over with the Deputy Warden to ensure this would happen. (para. 38). On 1/25/18 Defendant Bos, who was also a defendant in a 2015 lawsuit against EDCF staff for unjustified confinement of 20 plus years in ad seg, also issued a report reiterating Defendant Fuoss' report. (para.39). Defendant Bos denied Plaintiff's request a year earlier to be transferred away from EDCF because he felt that they would return him to long term ad seg at their first opportunity and this was supported by unit team Hoover who agreed with Plaintiff.(para.40). Defendant Schnurr was aware that Plaintiff had filed a lawsuit in 2015, grievance and Personal Injury Claim on 11/28/17 that named him a defendant and that Plaintiff's wife had intentions to sue him over the 11/25/17 incident. He also knew that Plaintiff did not have a hearing and had not been found guilty of any wrong doing yet he along with the above-named defendants approved and sent Plaintiff to long term seg at NCF. He also knew that the transfer would restrict Plaintiff's ability to talk with attorneys or his wife about this lawsuit.(para. 13)

17.

C) (1) Count III: _____

_____

_____

(2) Supporting Facts: _____

_____

_____

_____

## D. PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

1) Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action or otherwise relating to the conditions of your imprisonment? Yes [✓] No [ ]. If your answer if "Yes", describe each lawsuit. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

　　a) Parties to previous lawsuit:
　　　Plaintiffs: _Richard Grissom, #33728_
　　　Defendants: _Jessica Link, et al._
　　b) Name of court and docket number _Reno County District Court case number 19-CV-40_
　　c) Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?) _pending venue transfer to Butler County_

　　d) Issues raised _specifically compensation for Property Claim of #5,750 for the property that was destroyed._

XE-2 8/82　　　　　　　CIVIL RIGHTS COMPLAINT §1983

e) Approximate date of filing lawsuit _February 13, 2019_

f) Approximate date of disposition _____

1) I have previously sought informal or formal relief from the appropriate administrative officials regarding the acts complained of in Part C Yes ☑ No ☐. If your answer is "Yes", briefly describe how relief was sought and the results. If you answer is "No", briefly explain why administrative relief was not sought.

_Plaintiff exhausted all administrative remedies (exh. C, D, E, F, G)._

2) REQUEST FOR RELIEF

1) I believe that I am entitled to the following relief:

1. Expunge disciplinary conviction germane to the 11/25/17 incident
2. $200,000 compensatory damages - $200,000 punitive damages against Defendant Palm
3. $100,000 compensatory damages - $100,000 punitive damages against Defendant Loewen
4. $20,000 compensatory damages jointly and severally - $20,000 punitive damages against Defendants Schnurr, Bos, Randolph, Fuoss, Mansfield, Link and all unknown response officers.

_____          _[signature]_ pro se
Signature of Attorney (if any)                Signature of Plaintiff

_____

(Attorney's full address and telephone number)

XE-2 8/82             CIVIL RIGHTS COMPLAINT §1983                    5

19.